TAX COURT OF NEW JERSEY



**Kathi F. Fiamingo**
**Judge**

**120 High Street**
**Mount Holly, NJ 08060**
**Tel:  (609) 288-9500 EXT 38303**

NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

December 5, 2018

CORRECTED: To include missing page (page 17).

Michael A. Guariglia, Esq.
David J. Shipley, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Michael J. Duffy, Esq.
Deputy Attorney General
Division of Law
Attorney General's Office of New Jersey
R.J. Hughes Justice Complex
P.O. Box 106
25 Market Street
Trenton, New Jersey 08625-0106

> Re: Canon Financial Services, Inc. v. Director, Division of Taxation
> Docket No. 000404-2014

Dear Counsel:

This letter constitutes the court's opinion with respect to the motion for summary judgment filed by Canon Financial Services, Inc. ("plaintiff") to strike the revised assessment issued by the Director, Division of Taxation ("Director") on February 17, 2017 and the cross-motion filed by the Director to dismiss plaintiff's complaint. The court finds that the imposition of the Director's proposed five-factor formula without compliance with the requirements of the Administrative

*

Procedures Act, N.J.S.A.52:14B-1 et seq. violates the mandate as set forth by our Supreme Court in Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313 (1984) and as a result that part of the revised assessment allocating plaintiff's income on this basis must be set aside. The court further finds that under the circumstances of this case, where the Director permitted a deduction for related party interest paid in 2010 but denied that deduction, in part, for tax years preceding 2010, it is unreasonable to deny the related party interest deduction for tax years preceding 2010.

Thus for the reasons hereinafter detailed the court grants plaintiff's motion and denies the Director's cross-motion.

## A. Findings of Fact

Plaintiff is a commercial financial services company headquartered in Mount Laurel, NJ. It is a wholly owned subsidiary of Canon U.S.A., Inc. ("Canon U.S.A"), which is a wholly owned subsidiary of Canon, Inc. Canon, Inc. manufactures digital multifunction devices, copy machines, printers, and cameras. Canon U.S.A. is the exclusive importer and distributor of Canon, Inc. products in the United States. During all of the years in question, Canon U.S.A. sold the Canon products directly to large corporations and federal, state and local governments, to independent authorized dealers and resellers, and to its subsidiary Canon Solutions America, Inc. In turn, the independent dealers and resellers and Canon Solutions America, Inc. resold the Canon products to their customers.

Plaintiff offered lease financing to the customers of its parent, Canon U.S.A. and Canon Solutions America, Inc. In addition, leasing through plaintiff was available to the customers of the independent dealers and resellers. All of plaintiff's office functions were performed at its headquarters in Mount Laurel, NJ and all lending decisions were made in New Jersey. Plaintiff maintained no other offices either inside or outside the State. Plaintiff's business activities included the establishment of its lease rates and terms, the review and approval/denial of lease

2

applications, the administration of the leases during their terms (including the collection of monthly lease payments), as well as the facilitation of the final disposition of the leased property upon lease termination.

Once a lease application was approved and a lease agreement executed, plaintiff purchased the equipment to be leased and transferred possession to the customer. Although it does not appear plaintiff ever took physical possession of the leased equipment, it obtained and retained title for the duration of the lease agreement. Upon lease termination, plaintiff would arrange for the final disposition of the leased property by way of sale to the lessee or other purchaser, or by way of recycling.

Plaintiff had customers in all fifty states during the years under review and thus collected monthly lease payments in all States. The value of the equipment owned by plaintiff and leased to the customers located in the various states was between $0.7 billion and $1.2 billion.

In order to finance its operations plaintiff borrowed funds from its parent, Canon U.S.A. Plaintiff would determine the amount it needed to fund its operations based on projected cash needs. Canon U.S.A. would lend the needed funds to plaintiff generally on the last business day of a month.

The loans typically had a three-year term requiring the payment of principal and interest to be paid at the end of the three-year term. Interest was set at a rate one quarter of a percent higher than the two-year swap rate published by Goldman Sachs.

The loans were documented by a single page document, referred to by plaintiff as a "Note". Each such Note contained a reference line which read: "Re: US $ [XXX] Long Term Loan." Below the reference line was the heading "Notification of terms of the loan," under which were

3

listed the following "terms": 1) Loan amount[1]; 2) Effective Date; 3) Maturity Date; 4) Interest rate; 5) Repayment [of principal]; and 6) Interest Payment. Each Note contained the following statement: "Confirmation: Please confirm your agreement to the terms stated in this notice by return facsimile." Below the confirmation appeared a printed statement "We authorize you the terms of loan as above" and a space for the signature of a representative of Canon Financial Services, Inc.,[2] and a date. There is no dispute that the plaintiff made payments in accordance with the notes.

A Loan Agreement "made and entered into, as of July 1st 2010," was executed by Canon U.S.A. and plaintiff which set forth the general terms for a $920,000,000 line of credit made available to plaintiff. Among other things, the Loan Agreement specified the borrowing procedure to be employed by the parties, the manner in which the interest rate was established, and the principal repayment schedule. The Loan Agreement specified that interest was established in the same manner as in prior years, that is, at one-quarter of a percent higher than the two-year swap rate established by Goldman Sachs.

Plaintiff filed New Jersey Corporation Business Tax ("CBT") returns for the tax years 2004 through 2010. Plaintiff also filed returns for those years in separate reporting states, or was included in combined or consolidated tax returns filed by Canon USA and its subsidiaries in combined reporting states, such that its income was taxed or taken into account in all forty-seven states imposing a corporate income or franchise tax during such years.

On each of the CBT returns plaintiff filed for the years in question, plaintiff deducted all of the interest it paid to its parent and other related parties and calculated its taxable income by

---

[1] On a number of the Notes for loans made during the period 8/31/2007 through 4/30/2008, the "Loan Amounts" were blank, however, each of these Notes had the reference line indicating the amount of the loan being provided.

[2] Approximately 50% of the Notes did not contain a signature of a representative of plaintiff confirming the terms of the loans.

utilizing a three-factor allocation formula. On audit, the Director determined that plaintiff, having no regular place of business located outside the State, was required to allocate 100% of its income to New Jersey and exercised discretion under N.J.S.A. 54:10A-8 (§8) by allowing a credit for taxes paid to other jurisdictions where plaintiff filed a separate return.

The Director also determined that all interest deducted on loans paid by the plaintiff to related parties for the years 2004 through 2009 had to be added back to income. The deduction for interest paid to related parties in 2010 was allowed. The Director assessed late payment penalties and the amnesty penalty. A Notice of Assessment was issued on December 20, 2013, assessing additional taxes, interest and penalties in the aggregate amount of $21,218,020.38.

## B. Procedural History

Plaintiff filed a direct appeal in the Tax Court on March 4, 2014 contesting the assessment and demanding that it be reversed and set aside. Specifically, plaintiff contested the denial of its ability to utilize the three-factor formula, the denial of deduction for interest paid to related parties and the imposition of the late payment penalty, interest and the amnesty penalty. Plaintiff also contested the manner in which the Director applied the credit for taxes paid to foreign jurisdictions.

Plaintiff filed a motion for summary judgment to strike the assessment, which the Director opposed. The Director also filed a cross-motion for summary judgment to dismiss plaintiff's complaint. On October 13, 2016, the court issued a written opinion denying both plaintiff's motion for summary judgment and Director's cross-motion and remanding the matter back to the Director for further consideration of plaintiff's request for §8 relief.

After meeting, the Director issued a revised assessment and Conference Report on February 17, 2017. The revised assessment assessed taxes utilizing a "five-factor allocation formula", allowed in part the deduction for interest paid to related parties for 2004 through 2009,

5

and imposed underpayment penalties and an amnesty penalty. The total assessment with interest and penalties through March 15, 2017 was $11,078,145.34.

Thereafter, plaintiff filed the within motion for summary judgment. The Director opposed the motion and filed a cross-motion for summary judgment which the plaintiff opposed.

### C. Discussion

#### 1. Summary Judgment

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact challenged and the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995), our Supreme Court established the standard for summary judgment as follows:

> [W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.

"The express import of the Brill decision was to 'encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.'" Tsp. of Howell v. Monmouth Cty. Bd. of Taxation, 18 N.J. Tax 149, 153 (Tax 1999) (quoting Brill, 142 N.J. at 541).

> "[T]he determination [of] whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."
> [Ibid. at 523.]

There are no genuine issues of material fact in dispute. Thus, the matter is ripe for summary judgment.

2. Standard of Review

The review of this matter begins with the presumption that determinations made by the Director are valid. See Campo Jersey, Inc. v. Dir., Div. of Taxation, 390 N.J. Super. 366, 383 (App. Div.), certif. denied, 190 N.J. 395 (2007); L&L Oil Service, Inc. v. Dir., Div. of Taxation, 340 N.J. Super. 173, 183 (App. Div. 2001); Atlantic City Transp. Co. v. Dir., Div. of Taxation, 12 N.J. 130, 146 (1953). "New Jersey Courts generally defer to the interpretation that an agency gives to a statute [when] that agency is charged with enforc[ement.]" Koch v. Dir., Div. of Taxation, 157 N.J. 1, 15 (1999). Determinations by the Director are afforded a presumption of correctness because "[c]ourts have recognized the Director's expertise in the highly specialized and technical area of taxation." Aetna Burglar & Fire Alarm Co. v. Dir., Div. of Taxation, 16 N.J. Tax 584, 589 (Tax 1997) (citing Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 327 (1984)). The Supreme Court has directed courts to accord "great respect" to the Director's application of tax statutes, "so long as it is not plainly unreasonable." Id. at 327. See also GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 306 (1993) ("Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.")

However, judicial deference is not absolute. An administrative agency's interpretation that is plainly at odds with a statute will not be upheld. See Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 568 (2008) (citing GE Solid State, 132 N.J. at 306); Advo, Inc. v. Dir., Div. of Taxation, 25 N.J. Tax 504, 511 (Tax 2010).

3. New Jersey Corporation Business Tax Act

i.      General Principles of the Act. The New Jersey CBT requires all domestic and non-exempt foreign corporations to pay an annual franchise tax for the privilege of having or exercising

7

its corporate franchise in New Jersey, or for the privilege of deriving receipts from sources within the State or for the privilege of engaging in contacts within the State or for the privilege of doing business, employing capital or owning capital or property, or maintaining an office in New Jersey. N.J.S.A. 54:10A-2.

If a corporation has multistate income, an allocation factor is applied to determine the amount of its overall income subject to tax in the state. N.J.S.A. 54:10A-6 ("§6"). For the years under review, if a taxpayer did not maintain a regular place of business outside this State, the allocation factor was 100%.[3] If a taxpayer maintained a regular place of business outside the State, the statutory allocation formula for determining the proportionate share of the income attributable to New Jersey was a three-factor allocation formula taking into account the Corporation's state sales, payroll, and property.[4] Ibid.

ii. Discretionary Authority of Director. In some circumstances the application of §6 statutory allocation formulas may not produce a fair approximation of the net income attributable to a corporation's activities in the State. See, F.W. Woolworth Co. v. Dir., Div. of Taxation, 45 N.J. 466, 498 (1965); Metromedia, 97 N.J. at 323; SMZ Corp. v. Dir., Div. of Taxation, 193 N.J. Super 305, 317 (App. Div. 1984). In recognition of that possibility, N.J.S.A. 54:10A-8 (§8) provides discretionary authority to the Director to adjust the §6 allocation factor.

> Clearly, the language of [§8] vests broad authority in the Director to determine what income-producing activity of the taxpayer is reasonably referable to its business in New Jersey, so that this income can appropriately be used in the measure of the franchise tax. The statutory scheme recognizes that this is a highly specialized decision that entails considerable discretion. The Director's discretion is bound by standards of "sound accounting principles."

---

[3] The statute was amended to delete the 100% allocation factor for a taxpayer not maintaining a regular place of business outside the State for tax years beginning on or after July 1, 2010. See, L. 2008, c. 120, §§2 and3.

[4] The CBT apportionment factor changed as a result of legislative action in 2011. The formula converted to a single sales fraction formula following a three-year phase in which began January 2012. L. 2011, c. 59, §1.

It is nonetheless as broad as necessary to enable the Director to determine the fair value of the taxpayer's net worth, as well as the percentage of net worth and net income that can be attributed to New Jersey. (Internal citations omitted)

Metromedia, 97 N.J. at 324.

"[T]he Director not only has the authority but also the obligation to consider requests for adjustment on claims of unfairness which do not attain constitutional dimensions." F.W. Woolworth Co., 45 N.J. at 497. The intent of the Legislature in enacting §8 is for the "taxation of multi-state businesses [to] be administered on a basis which is equitable, and not merely constitutional to the corporate taxpayer as well as to the State." Id. at 499. See also, S.M.Z. Corp., 193 N.J. Super. 305; Hess Realty Corp. v. Dir., Div. of Taxation, 10 N.J. Tax 63 (Tax 1988); New Jersey Natural Gas Co. v. Dir., Div. of Taxation, 24 N.J. Tax 59 (Tax 2008).

Here plaintiff filed its returns without utilizing the 100% allocation factor applicable to it under §6 as a corporation without a regular place of business outside the state. Instead plaintiff applied the three-factor formula applicable to corporations which maintained a regular place of business outside the State. After audit, the Director denied the use of the three-factor formula and imposed the 100% allocation formula but granted §8 relief by providing plaintiff with a credit for taxes paid to other jurisdictions. See N.J.A.C. 18:7-8.3. Plaintiff appealed the Director's determination. In denying the Director's first motion for summary judgment, this court made an initial determination that an allocation factor of 100% with §8 relief providing a credit for taxes paid to other jurisdictions did not fairly or reasonably reflect plaintiff's business activities in this state. Despite this finding, the court did not agree with plaintiff that such a determination automatically entitled it to the application of the three-factor formula. The court also observed that the Director persuasively argued that strictly applying the three-factor formula did not fairly allocate plaintiff's business in this State. The court then remanded the matter to the Director for further consideration of the plaintiff's request for §8 relief.

Having further reviewed plaintiff's request for §8 relief, the Director now proposes a new allocation formula. The new formula allocates income essentially utilizing the three-factor formula, but divides the property fraction into two separate fractions: one for assets used by the plaintiff in its business operations and one for assets leased to its customers for use by them. Plaintiff objects to the application of this proposed allocation on several bases.

Plaintiff's overarching argument is that it is entitled to utilize the §6 three-factor formula because it is the "benchmark against which other apportionment formulas are judged." Hess Realty Corp., 10 N.J. Tax at 86 (citing Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 170 (1983)). Thus, plaintiff maintains that the three-factor formula reflects a fair and proper allocation of its entire net income.

It is true that the three-factor formula has been recognized as being "ordinarily a fair measure of the proportion of corporate activity within a particular jurisdiction," F.W. Woolworth, 45 N.J. at 496. However, plaintiff's position that it must therefore be applied to it inappropriately discounts the discretion and directive given to the Director in §8.

> [I]t must be iterated that the Legislature has given the Director wide latitude in fashioning an appropriate adjustment pursuant to § 8. The Legislature recognized that formula apportionment has a degree of imprecision and, as a result, some minimal amount of multiple taxation might result. Thus, plaintiff's idea of what is the fairest method of apportionment is not controlling. The question is not whether one technique as opposed to another should be used, but whether the method selected by the Director produces a degree of unfairness that amounts to "substantial inequity." (Internal citations omitted)
>
> [Hess Realty Corp., 10 N.J. Tax at 87-88]

It is precisely the imprecision effected by the application of the 100% allocation factor to plaintiff's business that resulted in the Director's determination to apply §8 relief. The court here utilized the analysis in Hess and determined that the §8 adjustment initially granted by the Director did not produce a fair and equitable result. It does not follow, however, that the three-factor

10

formula must then be utilized. As noted by Judge Andrew in Hess, the issue is whether the method selected by the Director produces an unfair result amounting to "substantial inequity." On the other hand, "if the resultant allocation can be considered 'fair and proper,' and the revenues so calculated can be regarded as 'reasonably attributable to the State,' the discretionary use of the [proposed factor under §8] would be authorized." Metromedia, 97 N.J. at 326.

For example, in New Jersey Natural Gas Co., the taxpayer was a corporation which, like plaintiff, did not maintain a regular place of business outside the State. There Judge Small found first, that the taxpayer did not "meet the statutory and regulatory requirements to apportion income under the Section 6 three-factor formula." 24 N.J. Tax at 64. Furthermore, the court there found that although the Director had misapportioned certain of the taxpayer's profits to New Jersey, that misapportionment and the method used by the Director did not "establish a degree of unfairness or inadequacy sufficient to override the discretion vested in the Director to effect an apportionment that fairly and reasonably reflects the [taxpayer's] activities in New Jersey." Id. at 87.

Here application of the three-factor formula as compared to the proposed five-factor allocation formula would result in allocation factors for the years under review as follows:

| Year | 3-Factor Allocation | 5-Factor Allocation | Difference |
|------|---------------------|---------------------|------------|
| 2004 | 0.307905 | 0.441769 | 0.133864 |
| 2005 | 0.303234 | 0.439287 | 0.136053 |
| 2006 | 0.298659 | 0.434272 | 0.135613 |
| 2007 | 0.294822 | 0.430485 | 0.135663 |
| 2008 | 0.295152 | 0.417081 | 0.121929 |
| 2009 | 0.295728 | 0.422487 | 0.126759 |
| 2010 | 0.313389 | 0.406449 | 0.093060 |

In evaluating the fairness of an allocation formula, the court is to determine whether the overall allocation factor formula properly reflects the taxpayer's activities in the state. Silent Hoist & Crane, Inc. v. Dir., Div. of Taxation, 9 N.J. Tax 178, 193 (Tax 1987). Here, the percentage

11

increases in the allocation factor using the proposed five-factor formula over those calculated under the three-factor formula range from 9% to 14%. Such differences are not so distortive as to result in substantial inequity where plaintiff's payroll factors are 90% or better for each year under review.[5] Although plaintiff's receipts factor for New Jersey receipts represented only 9% of total receipts on average, those receipts were generated by employees substantially all of whom were located in New Jersey. Thus, under the circumstances where a taxpayer's activities are substantially performed within the State and application of the five-factor formula produces tolerant variances over the three-factor formula, the court finds that the Director's exercise of discretion in applying the proposed five-factor formula can be considered fair and proper and does not unreasonably attribute plaintiff's income to this State.

Plaintiff further argues that the underlying reason for the Director's refusal to allow it to apply the three-factor is "simply because it does not meet the regular place of business requirement." Again, plaintiff bases this argument on its insistence that since the three-factor formula is the "benchmark", it is that formula which is applicable to it, notwithstanding the provisions of §6 which provide otherwise. During the years under review, the statutory allocation factor for a corporation which, like plaintiff, did not maintain a regular place of business outside the State is 100%. This statutory formula has been approved (with an appropriate §8 adjustment)

---

[5] Plaintiff's factors as determined by the statutory language of §6 for the years under review are as follows:

| Year | Payroll Factor | (All) property Factor | Receipts Factor |
|------|----------------|-----------------------|-----------------|
| 2004 | 0.899094 | 0.126714 | 0.103354 |
| 2005 | 0.906055 | 0.113806 | 0.096992 |
| 2006 | 0.900120 | 0.106936 | 0.092256 |
| 2007 | 0.907227 | 0.101655 | 0.085973 |
| 2008 | 0.895271 | 0.102575 | 0.080592 |
| 2009 | 0.920213 | 0.105835 | 0.079154 |
| 2010 | 0.990541 | 0.105148 | 0.079658 |

in S.M.Z. Corp., 193 N.J. Super. 305, Hess Realty Corp., 10 N.J. Tax 63 and New Jersey Natural Gas Co., 24 N.J. Tax 59, River systems, Inc. v. State, Dep't of Treasury, Div. of Taxation, 19 N.J. Tax 599 (Tax 2001). The court rejects plaintiff's assertion that it is entitled to apply the three-factor allocation formula in light of the clear language of the statute and the findings of the courts of this State to the contrary.

Plaintiff also argues that had it maintained a regular place of business outside of the State it would have been entitled to utilize the three-factor formula. Such a statement is shortsighted and does not comport with the statutory direction to the Director contained in §8. That is, the Director's direction §8 authority is not dependent upon whether the taxpayer maintains a regular place of business outside this State. The Director's ability to apply discretion to modify the allocation factor is dependent only upon whether the allocation factor determined under §6 "properly reflect[s] the activity, business, receipts, capital, entire net worth or entire net income of a taxpayer reasonably attributable to the State." N.J.S.A. 54:10A-8. Thus, the Director may exercise discretion to modify the allocation factor to any corporate taxpayer, and not just to taxpayers whose allocation factor was initially 100%.[6] See e.g. F.W. Woolworth, 45 N.J. 466, Reuben H. Donnelley Corp. v. Dir., Div. of Taxation, 128 N.J. 218 (1992) Brunswick Corp. v. Dir., Div. of Taxation, 11 N.J. Tax 530 (Tax 1991) and Metromedia, 97 N.J. 313.

Thus, plaintiff's argument that it is entitled to utilize the three-factor formula of §6 is, at its core, deeply flawed. Plaintiff was required by statute to utilize the 100% allocation formula. Recognizing the shortcomings of that formula, the Director exercised discretion under §8. See,

---

[6] The court pauses to acknowledge that at deposition the Director's conferee admitted that plaintiff would have been entitled to use the three-factor formula if it had a regular place of business outside the state during the years in question and in subsequent years after the repeal of the regular place of business rule. The conferee's statement, although not binding upon this court, is noteworthy, however, such later years are not before this court.

13

S.M.Z. Corp, 193 N.J. Super 305 (finding that the 100% factor is an allocation factor subject to adjustment under §8). The court found that the prior exercise of §8 discretion was lacking, and provided the Director with the opportunity to consider plaintiff's §8 request. The court rejects plaintiff's position that the only manner in which that discretion may be exercised is the allowance of the three-factor formula.

Under all of the circumstances presented in this matter, the court finds that the proposed five-factor formula does not unfairly result in a degree of unfairness or inequity sufficient to override the discretion vested in the Director to effect an apportionment that fairly and reasonably reflects the taxpayer's activities in this State.

ii.      Applicability of the Administrative Procedures Act, N.J.S.A. 52:14B-1, et seq.

Without more, the application of the five-factor formula would be an acceptable exercise of the Director's discretion. However, that determination does not end the court's inquiry. The court must also consider plaintiff's contention that the construction and application of the five-factor formula constitutes de facto rule-making requiring compliance with the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-1 et seq. See Metromedia, 97 N.J. 313.

In Metromedia the Supreme Court reviewed the Director's imposition of an "audience share" factor on a multi-state television and radio enterprise. That factor was designed to "measure receipts attributable to New Jersey by relating the taxpayer's revenues to its listening and viewing audiences in the state." Id. at 320. There the Court observed

> the statutory three-ply formula can only approximate the taxpayer's true net worth and income generated by its New Jersey activities. Hence, the Act gives the Director broad authority to adjust the allocation factor in order to reflect more accurately and fairly the activity, business, receipts, capital, entire net worth, or entire net income of a taxpayer reasonably referable to the state.
>
> Id. at 323

The Court concluded that the CBT "permit[ted] the discretionary choice by the Director to compute the corporate taxpayer's receipts attributable to New Jersey by the application of a factor based upon an 'audience share' in this state." Id. at 327-28. The Court then examined the question of whether the Director's determination to utilize the audience share factor constituted "de facto rule-making and, if so, whether that determination, in order to be valid, had to comply with the requirements governing the promulgation of administrative rules as provided by the APA." Ibid.

The Court determined that,

> [A]n agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.

> [Id. at 331-32]

In finding that the imposition of the audience share factor was rule-making, the court observed that "[i]t does not follow that, because the Director has statutory discretion, the manner in which this discretion is exercised is not governed by the standards that determine whether rule-making or adjudication must be followed in a given case." Id. at 333.

15

Accordingly, the court will review the Metromedia factors as they apply to the Director's attempted imposition of the five-factor formula.

In arguing against a finding of rule making, the Director first posits that the five-factor formula is not intended to apply to a large group or industry and that it was developed to apply solely to plaintiff and only after plaintiff filed its complaint in this matter. Moreover, the Director argues that a separate §8 analysis would be done for each leasing company and that the five-factor formula "can be applied prospectively on a case-by-case basis, but it is not intended as a rule of 'unvarying application.'" Thus, the Director maintains neither the first nor the second factor of Metromedia is implicated in this matter and that the determination to utilize the newly minted five-factor formula was adjudicatory and not administrative rule-making.

The court has no reason to question the veracity of the statement that the Director does not intend to apply the five-factor formula to any other similarly situated taxpayer. The Director's expressed intention alone, however, does not control the determination.[7]

Furthermore, while the impetus for the creation of the five-factor formula may have been the facts and circumstances of this specific taxpayer, its application may nonetheless constitute rule-making. That is, in Metromedia, the Tax Court found that the audience share factor was adopted only in the course of the audit and issuance of the assessment to that taxpayer. Metromedia, Inc. v. Taxation Div. Dir., 3 N.J. Tax 397, 406 (Tax 1981). There the court observed

---

[7] The court observes that it is curious that the Director would here maintain that the proposed five-factor formula is appropriate for plaintiff but not for a similarly situated leasing company. Plaintiff's circumstances do not appear to be so unique or unusual when one considers that any entity whose business is the leasing of personal property is likely to have customers both within and without the State. Thus, it is somewhat questionable that the proposal to bifurcate the property fraction by isolating those assets used by the taxpayer in its business operations from those leased to customers would not be equally applicable to other leasing companies. The court also questions why the distortion the Director alleges exists due to the leasing of property to customers at the customer's locations would not also exist once the regular place of business rule is repealed. Nonetheless, the court accepts the Director's contention that the five-factor formula will not be applied as a general rule prospectively.

that the "audience factor was, *though not denominated as such*, a rule of general applicability employed by defendant to permit him to make findings and render a decision in [that] case." Ibid. (Emphasis added). Moreover, the intent that the determination have wide coverage or that it be applied generally and uniformly to all similarly situated taxpayers are but two of the six Metromedia factors to be considered.

The third factor identified by the Metromedia Court is that, as here, the determination be designed only to operate prospectively. The Director acknowledged that the proposed formula could be applied "prospectively" on a case by case basis and thus concedes its prospective application.

The fourth factor identified in Metromedia is that the determination "describes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization." The Director argues that the fashioning of the new five-factor formula is clearly permitted or inferable from the statutory language of §8. The court does not agree.

§8 provides:

> If it shall appear to the commissioner that an allocation factor determined pursuant to section 6 does not properly reflect the activity, business, receipts, capital, entire net worth or entire net income of a taxpayer reasonably attributable to the State, he may adjust it by:
>
> (a) excluding one or more of the factors therein;
>
> (b) including one or more other factors, such as expenses, purchases, contract values (minus subcontract values);
>
> (c) excluding one or more assets in computing entire net worth; or
>
> (d) excluding one or more assets in computing an allocation percentage; or

(e) applying any other similar or different method calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State.

[N.J.S.A. 54:10A-8]

Here the Director has neither excluded a factor set forth in §8(a), included one or more other factors "such as expenses, purchases, contract values" (§8(b)), nor *excluded* one or more assets from an allocation percentage (§8(d))[8]. At best, the Director has proposed a "different method calculated to effect a fair and proper allocation of the entire net income . . . reasonably attributable to the State." §8(e). In this regard, the court agrees that subsection (e) provides general authority to the Director to propose such different methodologies but does not agree that that authority clearly permits or infers the proposed five-factor formula.

In Brunswick Corp.v. Dir., Div. of Taxation 11 N.J. Tax 530 (Tax 1991), aff'd, 13 N.J. Tax 136 (1993), the court approved the Director's determination to include rental property in the definition of property under §6. There, however, the Director complied with the requirements of the A.P.A. and adopted a regulation.

No such regulation had been adopted in Reuben H. Donnelley Corp. v. Dir., Div. of Taxation, 128 N.J. 218 (1992). However, the Supreme Court found that the Director's exclusion of "safe harbor lease" (SHL) property was not rule-making because,

> the change in the Director's position was specifically dictated by the 1982 amendments; second, that N.J.A.C. 18:7-8.1 was not a "definitional regulation" but merely an instruction on the manner in which the property fraction was to be computed; and last and most important, the Director's conclusion that SHL property should be excluded from the property fraction was "plainly inferable" from the 1982 CBT amendments. 11 N.J.Tax at 258.

[Id. At 230-31]

---

[8] The court does not consider the application of §6 relative to the net worth calculation.

Bifurcating the property fraction cannot be said to be "explicitly" within any of the directions set forth in §8, nor does any other statutory or legislative directive apply which plainly infers such a result. Although §8 permits the Director to exclude a class of assets from the property fraction, the proposed five-factor formula does not achieve a simple exclusion of a class of assets. Instead, it excludes a class of assets from the property fraction and then accords those same excluded assets a status equal to the non-excluded assets in a newly expressed additional property fraction.

Moreover, the property fraction is clearly and unequivocally defined in §6 as "the average value of the taxpayer's real and tangible personal property within the State during the period covered by its report divided by the average value of all the taxpayer's real and tangible personal property wherever situated during such period." Separating the taxpayer's tangible personal property into two categories, operating assets and assets leased to customers, cannot be clearly inferred from the authorization provided in §8. The statutory definition in §6 is directly contrary to such a division.

The fifth factor expressed by the Court in Metromedia is that the determination reflects an administrative policy not previously expressed in any official and explicit agency determination, adjudication or rule, or constitutes a material and significant change from a clear, past agency position on the identical subject matter.

> [A]n agency determination can be regarded as a "rule" when it effects a material change in existing law. This feature relates not only to fairness to the individual party actually before the agency but to other persons as well. When an agency's determination alters the status quo, persons who are intended to be reached by the finding, and those who will be affected by its future application, should have the opportunity to be heard and to participate in the formulation of the ultimate determination. (Internal Citations omitted.)

> [Metromedia, 97 N.J. at 330.]

19

Here the Director has provided nothing to suggest that the proposed bifurcation was ever suggested or applied in any other agency determination. The Director has provided no regulation, rule or other statement of the Director indicating that the property fraction would be divided into two separate and equal fractions represented by property owned by a taxpayer and used in the operation of its business and property owned by a taxpayer but leased to its customers. In fact, it is the Director's position that this proposal was fashioned for "just this taxpayer." Thus, it represents a departure from existing policy and procedure.

The sixth and final factor set forth in the Metromedia rule/adjudication determination is whether the agency determination "reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy." Id. at 332. The Director's determination here is no less "an interpretation of the enabling law and [ ] a decision on administrative policy comporting with the general definition of a rule under the APA", Id. at 335, than the decision to impose an audience share factor in Metromedia.

To be clear, the court does not question the authority of the Director to apply the five-factor formula under §8. Moreover, the court finds that the proposed formula would effect a fair and proper allocation of the plaintiff's income to this State. However, the discretion invested in the Director by §8 is not boundless. It must be circumscribed by both the dictates of the constitution and statutory proscriptions, including the rule-making requirements of the APA.

After applying the factors enumerated in Metromedia, the court finds that the features of rule-making predominated the Director's determination. Thus absent the promulgation of rules in compliance with the APA in this matter, the court finds that the Director's action in imposing the five-factor formula upon plaintiff is invalid.

iii.	Related Party Interest Deduction. Plaintiff also appeals the final determination for its denial of the deduction for interest paid to its related party, Canon U.S.A. Generally, a

20

corporation subject to the CBT is taxed upon its Entire Net Income (ENI) which is defined in N.J.S.A. 54:10A-4(k) as its "taxable income, before net operating loss deduction and special deductions, which the taxpayer is required to report . . . to the United States Treasury Department for the purpose of computing its federal income tax." Thereafter, however, several adjustments are required to be made. As relates to this matter, interest paid to related parties, which is deducted in computing federal taxable income, is to be added back to ENI unless excepted by one of five specifically described exceptions. N.J.S.A. 54:10A-4(k)(2)(I).

As applicable here, a deduction might be permitted in the following circumstances:

> (1) The 3% Exception. Where the taxpayer "establishes by clear and convincing evidence, as determined by the director, that" a principal purpose of the transaction giving rise to the interest payment was not to avoid taxes under New Jersey law, the interest rate is paid through an arm's length contract at an arm's length rate, and the related member is subject to tax, here or elsewhere, on its net income, including the interest payments, at a rate equal to or greater than 3 percent less than the tax rate applicable to the interest income in this State;
>
> . . .
>
> (5) The Unreasonable Exception. Where the taxpayer "establishes by clear and convincing evidence, as determined by the director, that the disallowance of a deduction is unreasonable."
>
> [Kraft Foods Global, Inc. v. Director, Div. of Taxation, 29 N.J. Tax 224, 233 (Tax 2016); aff'd _____ N.J. Tax _____ (App. Div. 2018).]

To qualify for the 3% exception, the taxpayer must show that the related party was subject to tax on the interest in New Jersey or another State at a rate equal to or greater than "a rate three percentage points less than the rate of tax applied to taxable interest by this State." Additionally, the taxpayer must demonstrate by clear and convincing evidence that the principal purpose of the transaction was not to avoid New Jersey income taxes, the interest is paid pursuant to "arm's length contract", at an "arm's length rate of interest." N.J.S.A. 54:10A-4(k)(2)(I)

Although the Director does not assert that the principal purpose of the loan transactions at issue was to avoid New Jersey income taxes, the Director maintains that the plaintiff has failed to establish by clear and convincing evidence that the interest was paid pursuant to an arms-length transaction at an arm's length rate of interest.

The applicable regulation, N.J.A.C. 18:7-5.18, does not define what is needed to be included in an arms-length contract or how to determine an arms-length rate of interest. The examples under the regulations require only that the "loans are at arm's length rates and properly documented." Id. The Director maintains that the loans were represented solely by the Notes which contain only the most basic information and are "devoid of terms that would be reflective of a true arm's length contract", such as the requirement of collateral and specified default provisions. In opposition, plaintiff argues that the loans were documented by written agreements evidencing the loan amount, the effective date of the loan, the maturity date, the interest rate, and repayment terms. Plaintiff further argues that provisions for collateral and specific default provisions are unnecessary.[9]

The court acknowledges that the notes here were not written with the precision one would expect when dealing with the significant amounts involved in these transactions. Despite that however, the court is not persuaded that the absence of every provision that might be included in a loan agreement between unrelated parties means that the Notes are not arms-length or "properly documented." Certainly throughout the financial world there are agreements made between parties which have varying degrees of specificity. Here the Notes provide for a principal amount, effective date, maturity date, interest rate, repayment of principal and interest dates. These provisions would

---

[9] Plaintiff's suggestion that it is the Director's obligation to provide expert opinion as to what is an arms-length agreement is rejected. The statute clearly requires the taxpayer to provide clear and convincing evidence of the arms-length nature of the transaction at issue.

permit the enforcement of the Notes and recourse to the assets of the borrower if not paid on the due dates. Thus, although not perfect, the notes contain provisions which are indicative of an arms-length agreement, documented in writing, and are accepted by the court as such.

Plaintiff's financial representative avers that the Loan Agreement set forth the borrowing procedure that had been in effect in prior years. Although the Director "does not concede" that the Loan Agreement sets forth the borrowing procedure in effect for prior years, the facts established by plaintiff and admitted by the Director, tend to support the plaintiff's position. The Director's refusal to "concede" does not specify how the prior years' procedures and the Loan Agreement vary. Moreover, the court's review of the Loan Agreement, accepted by the Director as an arms-length agreement for 2010, demonstrates that it contains terms and conditions substantially similar to those reflected in the notes for the prior years.

The question as to whether the interest rate charged was "at an arms-length rate" is slightly more problematic. Both plaintiff and the Director agree that the interest rate charged on the pre-2010 loans was calculated at one-quarter of a percent greater than the two-year swap rate published by Goldman Sachs. Plaintiff avers that this rate is an arms-length rate of interest for the loans under review. In response the Director did not "concede that the rate was an arm's length rate." Moreover, the Director points to the language of the statute which requires that the taxpayer establish the arms-length nature of the rate by "clear and convincing evidence" and maintains that no such evidence has been produced.

Plaintiff counters that the Director permitted the deduction for related party interest in 2010 once the Loan Agreement between it and Canon USA was executed. Although the Director does not "concede" this statement of fact, there is no dispute as to the manner in which the interest rate was calculated for all years under review. That is, in the pre-2010 years before the Loan Agreement was executed, the Director admits that the interest rate was set "at a rate one quarter of

23

a percent higher than the two-year swap rate published by Goldman Sachs." The 2010 Loan Agreement provides that the "Applicable Interest Rate" for the loans subject to that agreement is equal to the "spot rate of two year SWAPS (US $) as reported by Goldman Sachs plus one-fourth of one percent." Thus the manner in which the interest rate is determined for all years under review is identical.

The dilemma is that although the Director denies that the plaintiff established by clear and convincing evidence that the interest rate charged on the pre-2010 loans was at an arms-length rate, the Director accepts that same interest rate for the post 2010 years as being at arms-length[10]. Clearly, the issue of whether the rate of interest charged is at arms-length is a material issue required to be resolved for purposes of applying the 3% exception. Plaintiff provides no proof other than its financial officer's assertion that the rate is an arms-length rate for the loans under review. Without more the court would be constrained to deny plaintiff's summary judgment motion due to the existence of "a genuine issue of material fact" in dispute[11]. R. 4:46-2. As discussed below, however, the court finds that the plaintiff has provided the "more" entitling it to a deduction under the unreasonable exception.

To qualify for the unreasonable exception, the taxpayer "must produce clear and convincing evidence that disallowance of the interest deduction is unreasonable." Kraft Foods Global, Inc. v. Dir, Div. of Taxation, 29 N.J. Tax at 242. "Courts have recognized the Director's

---

[10] Technically, the Director did not concede that the post 2010 interest rate was at arms-length, however, the Director granted the deduction for related party interest once the 2010 Loan Agreement was executed, deeming that agreement an indicia of an arms-length transaction, including the calculation of the interest rate. The court can only conclude that the Director determined that plaintiff had established that the rate of interest set forth in the 2010 Loan Agreement was at arms-length.

[11] Under the circumstances presented here the court questions whether the dispute is genuine.

expertise in the highly specialized and technical area of taxation." Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J. Tax at 589 (citing Metromedia, Inc., 97 N.J. 313. The Director's expertise is entitled to "great respect", so long as the interpretation of operative law is not "plainly unreasonable." Metromedia, 97 N.J. at 327.

Here the Director permitted a partial deduction for the related party interest in 2004 through 2009 because N.J.A.C. 18:7-5.18(a)(2) allows an exception "when the related member pays tax on the income stream, which includes the interest income from the taxpayer." Thus to the extent the conferee found duplicative tax, a partial deduction was permitted. A further deduction was denied because "the Division takes the stance that the loans are not arms-length contracts." When that deficiency was cured to the Director's satisfaction by the execution of the Loan Agreement, the deduction was allowed in full.

Because the court finds that the notes constitute arms-length transactions, it finds the Director's refusal to grant the interest deduction in the prior years unreasonable. This decision is informed by the fact that the deduction was permitted, in full, for tax year 2010 under circumstances virtually identical to those in the prior years. Under those circumstances, the court finds it inherently unreasonable to deny the deduction in the prior years.

iv.    The Underpayment and Amnesty Penalties. N.J.S.A. 54:49-4, provides, in pertinent part, that "[u]nless any part of any underpayment of tax required to be shown on a return or report is shown to be due to reasonable cause, there shall be added to the tax an amount equal to 5% of the underpayment." N.J.S.A. 54:49-4(a). The regulation N.J.A.C. 18:2-2.7, provides that "[a]n abatement will be granted if the taxpayer can show reasonable cause for failure to file any return or pay any tax when due." Id.

To the extent there is any underpayment as a result of the application of the Director's proposed five-factor formula and/or the denial of deduction related party interest, such

25

underpayment, and the resulting penalty, is obviated. Plaintiff has not contested any other aspect of the assessment and the court has no basis upon which to determine whether or to what extent the assessment relates to any other issue. Thus the court makes no ruling as to any other underpayment which might exist as a result of the assessment, as revised.

Additionally, the Director imposed an Amnesty Penalty under N.J.S.A. 54:53-19(b):

> There shall be imposed a 5% penalty, which shall not be subject to waiver or abatement, in addition to all other penalties, interest, or costs of collection otherwise authorized by law, upon any State tax liabilities eligible to be satisfied during the period established pursuant to subsection a. of this section that are not satisfied during the amnesty period.

To the extent the imposition of the amnesty penalty rests on the application of an allocation factor other than the three-factor formula, or the denial of the deduction of related party interest, such penalty is inapplicable, as no underpayment exists.

### D. Conclusion

Summary judgment in favor of plaintiff is granted, to the extent described herein. Any issues in the assessment which have not been identified in this letter opinion shall remain unaffected. To the extent the assessment involves issues not resolved by this opinion and not contested by the parties, plaintiff and Director shall submit computations in accordance with R. 8:9-3 or 8:9-4, as appropriate. The Director's cross motion is denied.

Very truly yours,

Kathi F. Fiamingo, J.T.C.